## W. W. REA v. THE STATE.

1. CRIMINAL LAW. *Charge of court. Special instructions.* The defendant in a criminal prosecution is only entitled to have the law applicable to his case fully and fairly stated in a judicial form, and cannot of right demand special instructions, otherwise worded, upon points already thus stated.

2. SAME. *Same. Same.* Where, therefore, the court has properly charged the law in a case of circumstantial evidence, the defendant is not entitled to special instructions to the same effect, laying stress now upon

Rea *v.* The State.

the evidence necessary to establfsh the hypothesis of guilt, now upon the certainty required to exclude every other hypothesis, and now upon the duty of the jury in weighing the evidence.

3. SAME. *Same. Circumstantial evidence.* It is not error, after a proper charge in other respects correct, in a case of circumstantial evidence, to refuse to charge that the jury should not convict on circumstantial evidence unless it was as fully satisfactory to their minds as would be the positive swearing of one credible witness that he saw the act.

4. SAME. *Evidence. Record.* An objection to a record offered in evidence should specify the ground of objection.

5. SAME. *Same. Same.* Upon a trial for murder, where malice on the part of the defendant to the deceased must be shown, evidence is relevant that there had been a criminal trial in which the defendant was the principal witness for the State, and had been discredited by the deceased, whereby the prosecution failed, and the defendant was greatly enraged against the deceased, and the record of the case is the best evidence as far as it goes. Testimony of a mistrial in that case would not contradict the record showing a judgment of *nol. pros.*

6. SAME. *Same. Memoranda of judge's docket.* The memoranda of a judge on his trial docket are not a part of the record, nor competent evidence, but where the only object of its introduction was to show a mistrial in a particular case otherwise abundantly proved without objection, its admission would be no ground of reversal.

7. SAME. *Same.* Where, upon a trial of murder, the State, to show malice, has proved repeated threats made by the defendant against the deceased, it is not error to exclude, upon objection by the State, evidence tendered by the defendant that the witness had heard him say that he had no enmity against the deceased, wished to be friendly, and had sent him word to that effect.

8. SAME. *Same. Circumstantial.* The circumstances, in a case of purely circumstantial evidence, held sufficient to sustain a verdict of murder in the first degree.

FROM GILES.

Appeal in error from the Circuit Court of Giles county. W. S. McLEMORE, J.

S. E. ROSE and T. M. JONES for Rea.

Rea *v.* The State.

N. SMITHSON, E. T. TALIAFERRO and ATTORNEY-GENERAL LEA for the State.

COOPER, J., delivered the opinion of the court.

The prisoner has appealed in error from the verdict of a jury, and the judgment of the trial court thereon, convicting him of murder in the first degree.

The evidence was circumstantial, and the trial judge, after properly defining the various grades of homicide included in the indictment, and explaining to the jury what it was necessary for the State to prove in order to make out either offense to their satisfaction "beyond a reasonable doubt," continued his charge thus: "A reasonable doubt is difficult to define with any precision. Of course it is not every possible doubt, but it is that doubt engendered by an investigation of the whole proof, and an inability after such investigation to let the mind rest easily upon the certainty of guilt or innocence. In other words, it is an honest misgiving as to the guilt of the accused upon the proof, which the reason entertains and sanctions as a substantial doubt." Then, after stating the different positions of the State and the defendant in reference to the effect or result of the proof, his Honor said: "In order to convict a person of crime on circumstantial evidence, the circumstances must not only be consistent with the guilt of the accused, but must exclude every reasonable hypothesis but that of his guilt. In other words, the proof must exclude the idea that the deceased might have come to his death in a manner inconsistent with the guilt of the deceased. Or, at

least, the circumstances must be sufficient to convince the mind and conscience of the jury of the guilt of the accused beyond a reasonable doubt."

His Honor further said : " The defendant's counsel rely upon an *alibi,* that is that, at the time of the killing, the prisoner was in fact elsewhere, in some other place, that he was in his own house. The defense of an *alibi* is very conclusive, if clearly, fully and certainly established. It is a defense, however, so liable to abuse when a design exists to practice a fraud upon the State, and even when that design does not exist, by ignorant mistakes as to the particular hour and lapse of time, that it requires great strictness and caution on the part of the jury to avoid being misled by it. The defendant is not required to prove an *alibi* beyond a reasonable doubt, but you will take the proof touching the *alibi* in connection with all the other proof in the cause, and if it produce in your mind a reasonable doubt as to the prisoner's guilt, your duty is to acquit him."

The defendant's counsel asked the judge to charge the following five propositions, which he declined to do upon the ground that he had already charged upon the subject matter of all of them, viz:

" 1st. This being a case of circumstantial evidence, the circumstances should be of a conclusive nature and tendency. Such evidence is always insufficient, when assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true. For it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of

proof. Whenever, therefore, the evidence leaves it in-different which of several hypotheses is true, or merely establishes some indefinite probability in favor of one hy-pothesis rather than another, such evidence cannot amount to proof, however great the probability may be, to convict the defendant.

2d. It is essential that the circumstances should be a moral certainty, excluding all hypotheses but the one proposed to be proved, to-wit, the guilt of the de-fendant. For, in the language of the law, it is better that ninety-nine guilty men out of a hundred should escape than that one innocent man should be convicted.

3d. That it is the duty of the jury to enquire with the most scrupulous attention what other hypoth-e-is there may be, which may agree wholly or in part with facts in evidence. And if any other hypothesis agrees with the evidence, the jury should acquit the defendant.

4th. In criminal cases, the statement made by the accused is in this point of view, of the most essential importance, and should be carefully considered by the jury.

5th. The jury ought not only to acquit the accused unless the evidence excludes from their minds all rea-sonable doubts, as explained to you, of his guilt, but in no case ought the jury to convict a man of a crime, when his life is at stake, where the circumstantial evi-dence does not satisfy their minds as fully as they would be satisfied from the positive swearing of one credible witness that he saw the defendant fire the gun which took the life of the deceased."

These propositions, it will be noticed, are not charges upon the particular facts of the case before the court, but merely propositions of law applicable to any case of circumstantial evidence. They undertake to formulate the law on the subject in a shape deemed by the learned counsel most favorable to the accused. But clearly the counsel of the defendant cannot be permitted to select the words of a charge of the law, nor, of course, to give the charge in the form of an argument in favor of the accused. All that they can ask is, that the law which regulates the rights of their client shall be fairly and fully stated, in the form proper to come from an impartial judge. If, therefore, they ask for charges of points of law, which have already been fully and fairly made to the jury, there is clearly no error in refusing the request; and, *a fortiori*, if the wording of the propositions submitted is that of an advocate, not of a judge.

The burden of the several propositions is that in cases of circumstantial evidence alone the circumstances must be so strong, and so closely connected as to exclude every other reasonable hypothesis except that of the defendant's guilt. Repeated in different forms, laying stress now on the evidence necessary to establish the controlling hypothesis, now upon the certainty required to exclude every other hypothesis, and now upon the duty of the jury in weighing the evidence, this is the sum and substance of the various propositions. But the trial judge has already, in language borrowed from the opinions of this court, expressed the same idea in the form usually adopted in such

cases. He has said to the jury that the circumstances must not only be consistent with the guilt of the accused, but must exclude every reasonable hypothesis but that of his guilt. And he elsewhere explains to them the law which should govern them in weighing the evidence, and especially in their finding on the defendant's hypothesis of an *alibi.*

It is insisted, however, that the explanatory language of the judge, immediately following the clause just referred to, qualifies that part of the charge, and makes the whole paragraph amount to no more than the repetition of the charge upon the point of a reasonable doubt. The defendant was entitled to both charges: *Lawless* v. *State,* 4 Lea, 173; *Turner* v. *State,* 4 Lea, 206. And so his Honor told the jury. What he meant by the closing words of the clause was, that the circumstances must be sufficient to convince the mind and conscience of the jury of the guilt of the accused beyond a reasonable doubt, to the exclusion of every other idea or hypothesis. He so understood it, when he told defendant's counsel that he had already charged their five propositions, and they so understood the charge, or they would have requested a modification of the language. The charge, taken together, admits of no other construction than that the jury must be satisfied of the guilt of the prisoner beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis.

The last of the requested propositions is that the jury should not convict on circumstantial evidence unless it was as fully satisfactory to their minds as would

be the positive swearing of one credible witness that he saw the defendant kill the deceased. It is conceded by the counsel of the prisoner that they have been unable to find any authority in support of the proposition. The authorities are in fact to the contrary: *Cicely* v. *State*, 13 Sm. & M., .202; *Jane* v. *Commonwealth*, 2 Met. (Ky.), 30. The reason is obvious. The instruction only says in a different form that the jury ought not to convict unless every reasonable doubt was excluded, and is therefore unnecessary. If it means more, it would require a certainty which would exclude circumstantial evidence altogether. And the danger is that to many minds it would appear to fairly imply the higher degree of . certainty. It would, moreover, require the juror not only to enquire into the state of his mental convictions upon the question of reasonable doubt, but to go further and institute a comparison between the degree of conviction produced by the evidence, and that which would be the result of the testimony of one direct witness. It would, to use the language of the Supreme Court of Mississippi in the case cited above, "apply a rule which is neither practical nor altogether safe." No such instruction has ever been sustained in this State, nor has any good reason been advanced why it should now be adopted.

To show a motive for the prisoner's enmity to the deceased, the attorney-general . read the record of a presentment against one George W. Clark for carrying a pistol, made by the grand jury upon the testimony of the prisoner, and the record of an indictment against

the same person for an assault and battery on the prisoner, who was the prosecutor. The minutes of the court, under date of November 30th, 1880, contained an entry of a judgment discharging the defendant Clark from the first charge upon a *nolle prosequi* by the State, and a judgment of condemnation by confession under the indictment. The State introduced the judge's trial docket at the November term of the court, and read from it the docket entry of the case for carrying a pistol, and the judge's memorandum thus:

The State
148    *v.*    C. pistol. Nov. 30, mistrial. Nol. pros. 30th.
G. W. Clark.

The State further proved by witnesses, without objection, that Clark was tried under the presentment for carrying a pistol; that the trial was held on November 30, 1880; that the prisoner was the principal witness for the State, and that the deceased, and two or three other persons, were introduced as witnesses by the defense, and swore that they were well acquainted with the general character of the prisoner, that his character was bad, and that they would not believe him on oath; that the jury failed to agree; and that the prisoner was greatly enraged against the deceased because of his testimony.

The bill of exceptions, after setting out the record and proceedings in the two prosecutions against Clark and the entries on the judge's docket, shows the following objection: "To all of which defendant, by his counsel, objected, which objection was overruled by the court, to which defendant then and there excepted."

An objection to a certified copy of a record must specify the ground of objection, or it will be of no avail: *Garner* v. *State,* 5 Lea, 21.  The practice in this State has been to read the original papers and records of a cause upon a trial in another case in the same court in which they are offered in evidence: *Nichol* v. *Ridley,* 5 Yer., 63.  An objection to the original record ought to be as specific as an objection to a certified copy.  Nevertheless, in a criminal case involving human life, we are not inclined to visit on the defendant the consequences of the oversight of his counsel.

The objection now taken to the records read is that they were not relevant to the issue, and that the entry on the judge's docket was not evidence for any purpose, and certainly not to contradict the minutes of the court.  The issue in the present case was the guilt or innocence of the prisoner of the crime for which he was being tried, and to make out the charge of murder in the first degree it became necessary to show malice and premeditation.  For this purpose, it was relevant to introduce proof tending to establish a ground of enmity between the prisoner and the deceased.  Evidence that there had been a criminal trial in which the prisoner was the principal witness for the State, and that he was discredited by the deceased, whereby the prosecution failed, and the defendant greatly angered, was clearly relevant.  The best evidence for this purpose, as far as it would go, was the record of the cases.  And testimony that there was a trial of the presentment, in the course of which the prisoner

and the deceased were opposing witnesses, before the entry of a *nol. pros.*, was admissible, for it did not contradict the record. The result of the trial may have led to the judgment. The parol proof was not objected to by the defendant. The objection made in argument is to the judge's memoranda on the trial docket. These memoranda, it is clear, were no part of the record, and should not have been admitted. But the only object of their introduction was to show that there was a mistrial, and inferentially a trial. But this fact was established by the positive testimony of several witnesses, without objection, and was not disputed, the defendant both in writing and conversation being shown to have referred to the trial, and the course of the deceased on that occasion. The court can clearly see that the memorandum was useless, and that its admission as evidence could not possibly have prejudiced the prisoner: *McAdams* v. *State*, MS. opinion at this term.

The State proved, as we have mentioned, that on the day of the trial of the presentment against Clark, the defendant was greatly enraged at Goodrum for discrediting him, and used threatening language on the subject. There was a wedding at defendant's house on the 2d of December after the trial, to which deceased had been invited. Defendant wrote deceased a letter forbidding him to come to his house. And on that evening, he repeatedly said to several persons, and while at the table with his guests, that he would kill Goodrum, as one witness testifies, but as most of them say he would kill him if he came upon his premises.

There is testimony of hostile language on other occasions. And one witness testifies that on May 1, defendant said to him that these fellows in the store were mad at him, and he would oust them yet.

In this state of the proof, the defendant offered to prove by his brother, and other witnesses, that after the wedding and before the killing, the witness had heard the defendant say that he had no enmity against deceased, and wished to be, friendly with him, and sent him word to that effect. The State objected, and the objection was sustained. It is suggested, not argued, that this was error. But we are not aware of any principle upon which a criminal can thus be allowed to make evidence for himself.

The evidence on which the prisoner was convicted is circumstantial, and his counsel have dwelt upon its insufficiency to sustain the verdict.

The prisoner resides about two hundred yards nearly due east from a country store, which fronted on a public road running nearly north and south, and at which was kept the post-office of the neighborhood. James A. T. Goodrum, a young man, was a clerk in the store. On the night of the 23d of July, 1881, he was in the back room of the store with one Dwyer, a school master, who was teaching him latin. J. K. Trigg, the owner of the store, resided in a house about thirty yards to the south-west. His brother H. W. Trigg lived about one hundred yards from the store in a south-easterly direction, his dwelling being about one hundred and fifty yards from the house of the prisoner. The public road was fenced on both sides,

the fence on the east belonging to the prisoner, and the fence on the west to J. K. Trigg. There was a fence around the store, to the north of which was first a potato patch or garden, and then a corn field extending to the fence on the road. The prisoner had access to the road and the store by a private path through his lot. To the north of this path, immediately adjacent to the fence on the public road was a sorghum patch, and behind in the same enclosure a corn field. The weather had been very dry, and the ground was dusty.

About 9 o'clock on the night of the 23d of July, J. K. Trigg called to Goodrum from his residence to tell him the meaning of a word. Goodrum got up from his chair, went to the door which opened to the south, and answered the question. As he turned from the door to resume his seat, he was shot through a window in the rear of the room, five large buck shot striking him, one passing through the heart, and another through the head. Dwyer called for J. K. Trigg, and the two lifted deceased from the floor to which he had fallen, and placed him on the bed. J. K. Trigg then ordered his servant girl to go to his brother's, and ask him to ride for a doctor. H. W. Trigg was sitting in his house smoking, and heard the shot. He heard his brother's directions to the girl, and without waiting for her arrival, hastened to the stable about forty yards distant, caught up a bridle and put it on his horse, led the horse fifteen or twenty steps to the gate, where he met the girl, leaped on the horse and rode at a lope about one hundred yards to the house

of a negro, whom he had in the meantime called out, put the negro on the horse, and directed him to ride for the doctor. The negro had gone fifty or seventy-five yards, when J. K. Trigg called out that Goodrum was dead, and requested that the negro be sent for the neighborhood constable, which was done. H. W. Trigg then turned back, and when near the stable, and about twenty yards from his gate, the defendant called to him from his house to know what was the matter, to which he replied that Goodrum had shot himself. The defendant made no further inquiry, and neither went to Trigg's house or to the store. All the neighbors, for two or three miles around, came to the store during the night. A watch was kept to prevent any person from going to the rear of the store where the assassin had stood.

Early the next morning, before it was fairly light, Dwyer, Trigg, the constable, and others during the morning, examined the grounds. They found the place where the person stood who shot the gun. The weeds were freshly broken down, and the ground indented by his feet. By tracing backwards, it was found that the footsteps could be followed over the fence around the store, thence slightly diverging from that fence to the road, and across the road into the defendant's sorghum patch, and thence southward to the path from his house to the store. In other words, the person who shot the gun had gone from the path into the defendant's corn field and sorghum patch, thence across the road into Trigg's field and potato patch, and over the fence to the point at which he stood when he fired.

24—VOL. 8.

It was further found, that in going from this spot the person had started nearly north, crossing the store fence, thence north-easterly, through the patch and corn field, to the road at a point about fifty or sixty yards north of the store, thence across the road, angling southwardly, into the sorghum patch, thence to the corn field east, thence with the corn rows, changing the rows twice on account of weeds, to the path from the defendant's house to the store, and thence in the direction of defendant's house, to within forty yards of the house. The tracks were the same both going and coming, were measured, and were such as would be made by a number seven shoe. In going from the place where the shooting occurred, the tracks were those of a man in a rapid. walk, or, to use the words of the witnesses, "beyond the ordinary pace." Some of those present went to defendant's house, and calling him out, asked him if he had heard any person go by that night. After a slight hesitation, he replied in the negative. They then said to him, that the footsteps had been tracked to within forty yards of his house. He then said, that he believed he did hear his wife say that she heard two or three persons pass last night, and the dogs run out and bark. The defendant asked if they had examined for tracks about his barn, but did not offer to aid them. The way to the barn led off from the path to the store. The parties examined, and did not find the tracks on this way.

The defendant was taken into custody for the murder about 12 o'clock that day, being Sunday, and was examined by the committing magistrates on the next

day. At some time, exactly when does not appear, defendant walked out with some of the witnesses to examine the tracks in the field, and was noticed to walk on his toes. He said he had gravel in his shoes, and stopped two or three times to take the gravel out, but continued to walk on his toes, without making full tracks. The proof is that he wears "about a number seven shoe."

The defendant said that at the time the shot was fired, he was in his kitchen, a few steps from his house, making a poultice to dress a blister on his wife, who was sick; that his wife called him two or three times, but he did not go; that she then called her two little nieces, who were sleeping in her room, but could not wake them; that she then called him again, and he went to her; that she asked him if he had heard the gun, and he replied that he had. She then asked what it meant, and he went out and called to H. W. Trigg, as stated by Trigg.

The argument on his behalf is that he was in the kitchen at the time the gun was fired, and, at any rate, that he could not have shot the gun, and called to H. W. Trigg from his house within the time he did. The distance direct between defendant's house and the store is about two hundred yards. The distance from the spot where the gun was fired, following the retreating steps in the course pursued to defendant's house, was about three hundred yards. It could be walked leisurely in six or seven minutes. It was actually run, as an experiment, by a person with a stick in his hand in one minute and a half.

H. W. Trigg says he talked with his wife a minute and a half before he started for his horse. The distance then traversed by him before defendant called to him was from two hundred and fifty to three hundred yards; he thinks it was five minutes from the time of the shot until defendant called to him. It is obvious, that the question of time presents no difficulty.

The proof shows that on the morning of the murder, about ten or eleven o'clock, the defendant borrowed a double barrel shot gun from a neighbor, saying that it was to kill a squirrel for his wife. He had made the same statement of his purpose to a witness on his way to the neighbor's. He got the gun. That evening, two shots were heard back of his barn. The gun, when borrowed, was loaded with squirrel shot. Afterwards, many marks of squirrel shot were found in a beech tree back of his house, and portions of paper powder marked, with shot holes through them, were found near the tree. These pieces of paper were ascertained, from the printed matter on them, to have been torn from a copy of a newspaper called the Pulaski Citizen of June 5, 1879. About forty-five steps from the tree, where he seems to have stood, other pieces of paper, not powder marked, were picked up, and a large buck shot of the size of those taken from the body of the deceased, and subsequently found in the gun. Thes pieces of paper were ascertained to have been torn from a copy of the Nashville Banner of March 24, 1881. In the rear of the store, between the window and the place where the person stood

when the gun was fired, pieces of wadding, scorched and powder marked, were picked up.   These fragments were found to be parts of the Pulaski Citizen of June 5, 1879, and of the Weekly Nashville Banner of the 24th March, 1881.   The gun was found at defendant's house, up stairs, both barrels loaded.   Defendant said at the time that he had loaded the gun, that there were seven buck shot in one barrel and six in the other; that he had lost some meat and molasses and loaded the gun for thieves.   The gun was unbreached, and the loads taken out, in the presence of the defendant, before the committing court on Monday morning.   It was found that there were seven buck shot in one barrel, and six in the other, of the size of those cut out of the body of the deceased, and of the one shot found near the tree behind the barn. The wadding taken from the right hand barrel consisted of pieces of the Pulaski Citizen of the date of June 5, 1879.   The wadding taken from the left hand barrel consisted of fragments from the Weekly Nashville Banner of March 24, 1881.   The shot pouch, which defendant had borrowed with the gun, was obtained at defendant's house on Tuesday morning, and was found to contain fragments of the same number of the Pulaski Citizen and of the Nashville Banner.

It will thus be seen that the powder burned wadding shot from the gun near the tree back of defendant's house, and which was put into the gun by the owner, the fragments of paper found in the right hand barrel of the gun, and some of the fragments taken from the pouch and picked up under the window,

consisted of parts of the same number of the Pulaski Citizen.

It will also be seen that pieces of the scorched wadding found under the widow through which Goodrum was shot, the wadding of the left hand gun barrel, some of the fragments of the shot pouch, and the fragments found where the defendant stood when shooting at the beech tree, are all from the same number of the Weekly Nashville Banner of the 24th of March, 1881.

The owner of the gun did not take the Banner, and is certain he loaded the gun with wadding from the Pulaski Citizen or the Pulaski Herald; he thinks from the Citizen. Dwyer, the school teacher, had received twelve copies of the Weekly Banner of the 24th. March, 1881, sent him as specimen copies for distribution, and he had given one of these copies to the defendant.

The only material evidence offered in defense consists of the testimony of the defendant's brother, and the mother of his wife. They both testify that when the shot pouch was sent for on Tuesday morning, the latter hunted it up, and handed it to the former, and he in her presence put his hand into the pouch, turned it upside down, and shook it, and there was nothing in it. A little boy, twelve years of age, who went after the pouch, took it to the store, and it was examined by another witness in his presence, and they found in the pouch the fragments of the Weekly Banner and Citizen introduced in evidence. In addition, a witness on the trial proved that a fragment of the

Rea *v.* The State.

Banner taken from the pouch and another fragment taken from the left hand gun barrel, and the defendant admits he loaded both barrels, dovetailed. "The edges of the two," he says, "read together making correct words."

The evidence is sufficient to sustain the verdict, and the judgment must be affirmed.

W. W. Rea, alias Wm. Rea, you have been found guilty, by a jury of your county, of the crime of murder in the first degree without mitigating circumstances, and we have discovered no error in the proceedings. It becomes our duty to pronounce upon you the judgment of the law. That judgment is, that you be remanded to jail, and be taken thence to the county of Giles, and there securely confined until Friday, the 21st of April, 1882, on which day, between the hours of two and four o'clock in the afternoon, and on a gallows to be erected for the purpose within one mile of the court-house, you be hanged by the neck until you are dead.